IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

THE KLAMATH TRIBES, a federally
Recognized Indian Tribe

                                          Case No. 1:21-cv-00556-CL

        Plaintiff,                         OPINION AND ORDER

    v.

UNITED STATES BUREAU OF
RECLAMATION,

        Defendant.

_____

MCSHANE, Judge:

      By all accounts, 2021 will be one of the worst of many bad draught years to visit the

Klamath Basin.  The impact that mother nature will have on the Upper Klamath Lake will be

extensive; impacting tribes, farmers, fisherman, the C'waam and Koptu living in the lake, the

downstream salmon and their ocean predators, the families living in communities supported by

fishing and irrigation.  And while the source of the Klamath River is in Oregon, the devastation

1 – OPINION AND ORDER

will flow through communities and ecosystems in Northern California and on to the Pacific Ocean.

For decades, water shortages in the basin and the government's need to protect endangered species have led to conflict and litigation between the tribes, farmers, fishing interests, and government agencies.  The parties to the case are well aware of the extensive history of this conflict so it will not be repeated here.  What can be said is that the Klamath River was once the third largest salmon producer on the West Coast and Upper Klamath Lake teemed with a variety of fish that were an important part of the Klamath Tribes' cultural heritage. The subsequent draining of wetlands and the building of dams, along with the impacts of climate change, have led to decreased water levels that are incapable of sustaining the interests of any one stakeholder completely.

The Plaintiffs are the Klamath Tribes, a federally recognized tribe consisting of three peoples who traditionally inhabited the Klamath Basin.  The cultural, spiritual, and economic health of the Klamath Tribes is inextricably linked to the health of two important food fish which were once caught by the thousands every year, the C'waam and the Koptu. THE KLAMATH TRIBES, https://klamathtribes.org (last visited May 5, 2021). Now endangered, the Tribes are limited to harvesting just two fish every year for ceremonial purposes. *Id.*

The Plaintiffs claim that the government's current plan to regulate water in the Klamath Basin violates the government's obligations under the Endangered Species Act.  Specifically, they allege that the Defendant Bureau of Reclamation failed to adequately consult with the Department of Fish and Wildlife as it attempts to regulate water flow from Upper Klamath Lake, knowing that there would be an incidental take or decline in the endangered C'waam and Koptu

The Defendant Bureau, in addition to asserting that the court lacks jurisdiction, argue that the Tribes are unlikely to prevail on the merits of their claims. They argue that the Bureau is managing resources under hydrologic conditions that are beyond its control, and that they have done so in consultation with expert agencies and relevant stakeholders. The assert that they are under an obligation to account for all competing interests with an eye toward science, species preservation, and irrigation rights. In essence, the government is telling me that they are doing the best they can under a very bad set of circumstances, that they are in compliance with the relevant sections of the Endangered Species Act, and that no interested party is going to get through the year without great hardship.

Plaintiffs ask this Court to limit the flow of water coming out of Upper Klamath Lake to the detriment of a threatened salmon population, an endangered Orca population that depends on salmon recovery, and irrigation interests. The Court declines to do so. Here, the Defendant Bureau, in coordination with expert agencies and all competing interests, is better equipped to serve the public interest than a judge with a law degree. And while the interim plan and decisions being made by the Bureau may result in the incidental taking of an endangered species, the Bureau has taken the appropriate steps under the Endangered Species Act to address the difficult drought situation that is presenting itself this year in the Klamath Basin.

## **BACKGROUND**

Plaintiff alleges that the Bureau is currently releasing water from Upper Klamath Lake at a rate that endangers the C'waam (Lost River sucker, *Deltistes luxatus*) and Koptu (shortnose sucker, *Chamistes brevirostris*), two culturally, spiritually, and ceremonially significant fish for the Tribes. Pl.'s Mem. Supp. TRO 1–2, ECF No. 2. The Bureau manages the Klamath Irrigation Project under the Klamath Project Operations Plan. The operations plan is controlled by input

3 – OPINION AND ORDER

from two different agencies, United States Fish and Wildlife Service ("USFWS") and the

National Marine Fisheries Service ("NMFS"), which both submit biological opinions regarding

the effects of the operating plan on endangered species and their habitats. Pl.'s Mem. Supp. TRO

4–5. The USFWS biological opinion discusses the effects on the C'waam and Koptu, both

endangered as defined in the Endangered Species Act ("ESA"); The NMFS biological opinion

covers the effects on the threatened Southern Oregon/Northern California Coast ("SONCC")

coho salmon and the endangered Southern Resident Killer Whale, which depends on the chinook

salmon as a source of food. Pl.'s Mem. Supp. TRO 1, 8.

In 2018, the Bureau submitted their 2019-2024 operations plan to NMFS and USFWS.

Following consultation, NMFS and USFWS released biological opinions in 2019, finding that

the plan was not likely to jeopardize the continued existence of the SONCC coho salmon, the

Southern Resident Killer Whale, or the suckers. Pl.'s Req. Judicial Notice, Ex. 2 at 5, ECF No. 3

("IOP"). In October 2019, when new information came to light showing that there would be

effects on the salmon, the Bureau reinitiated consultation with NMFS and USFWS. *Id.* at 1–2.

Because more time was needed to complete the formal consultation process, the Bureau

developed an Interim Operative Plan. The Interim Operative Plan provides that the 2019 NMFS

BiOp will operate until such a time as the consultation can be completed, with one major

difference. The Interim Plan allows for augmentation of the Environmental Water Account to be

used for a "surface flush" to assist in indirectly disrupting the life cycle of a parasite to the

salmon. Pl.'s Mem. Supp. TRO 6. This augmentation is provided when the amount of water in

Upper Klamath Lake is predicted to be above a certain amount in April and May. IOP at 7–8.

However, water that would otherwise go to Upper Klamath Lake can only be used for the flush

so long as it does not impact "the suckers in UKL outside of those analyzed by USFWS." Pl.'s

4 – OPINION AND ORDER

Mem. Supp. TRO 6. The Interim Operative Plan goes through September 2022, or until consultation has finished regarding a modified or new operations plan, whichever is earlier. IOP at 2. In April 2020, USFWS released a biological opinion analyzing the effects of the Interim Plan on the suckers and found that the Interim Plan, as proposed, was not likely to jeopardize the continued existence of the suckers. Pl.'s Req. Judicial Notice, Ex. 1 at 187 ("2020 BiOp").

The analysis in the USFWS 2020 BiOp is based on assumptions about future hydrologic conditions and contains certain boundaries in the Terms and Conditions to determine if the conditions are still within the scope of the analysis. 2020 BiOp at 8, 110, 112–13, 213. If the Upper Klamath Lake falls below these boundary elevations, the "no jeopardy" determination in the 2020 BiOp may not apply. These boundary elevation levels account for the different needs at different points of the life cycle of the C'waam and Koptu.

The suckers depend heavily on the water elevation of Upper Klamath Lake for breeding, avoiding predation, and water quality. *See* Pl.'s Mem. Supp. TRO. The suckers spawn in April and May at depths from .4 feet to 2.3 feet. 2020 BiOp at 73. To maintain optimal spawning conditions, the elevation of Upper Klamath Lake must not sink below 4,142 feet in April or May. *Id.* at 207. When the lake is between 4141.4 and 4142.0 feet, the suckers have a reduced spawning duration by about 20%. *Id.* at 206. When the lake is below 4141.4 feet, there is a reduction in the number of spawning individuals and a reduction in the amount of time spent in the spawning areas. *Id.* at 74. For example, if elevation levels were as low as they were in 2010 (4140.47–4141.0 feet), there would be a 14% reduction in the number of females spawning and a 36% reduction in the amount of time spent at spawning sites. *Id.* at 206; Buettner Decl. Ex. A, ECF No. 6. Upper Klamath Lake stood at 4140.84 feet on April 1, 2021 and 4140.63 feet on

5 – OPINION AND ORDER

April 22, 2021. Buettner Decl. ¶ 32; Stip. Req. Judicial Notice, Ex. 18 at 40, ECF No. 24. Upper

Klamath Lake has already fallen below 2010 elevation levels. *See* Buettner Decl., Ex. A.

    Another critical time for the suckers is in July when they migrate to Pelican Bay. Pl.'s

Mem. Supp. TRO 16. Water quality becomes a significant issue in the summer months and

Pelican Bay serves as a refuge of good quality water. *Id.* To enter Pelican Bay, the suckers must

pass through a shallow portion of Upper Klamath Lake which the fish can only navigate if it is

no less than three feet deep. *Id.* If the suckers are unable to access Pelican Bay, they are more

subject to "mass mortality events" associated with the spread of disease, overcrowding, and

increased predation. *Id.* The suckers are best protected from predation when the water in Pelican

Bay is six feet; a depth of more than 3.3 feet is necessary to reduce the most severe effects of

Pelican predation. 2020 BiOp at 125. When Upper Klamath Lake is at 4138 feet, Pelican Bay is

at a depth of 3.5 feet. *Id*. So long as Upper Klamath Lake remains above 4138 feet, as predicted,

the majority of the risk of predation will be removed. While water quality has been a significant

issue affecting the suckers, USFWS has found "no clear and statistically significant connection

between UKL levels and water quality over the range at which the lake is usually managed (4138

to 4143.3 ft.)."[1] 2020 BiOp at 128.

    Under the 2019 NMFS BiOp, the target flows for Iron Gate Dam increase from 1,000cfs

in March to 1,325 cfs in April. 24-2 at 271. At the same time, April 1 begins the 4142 feet

elevation boundary for Upper Klamath Lake under the 2020 USFWS BiOp. 2020 BiOp at 213.

Despite the historically low levels of Upper Klamath Lake and the requirement for higher levels

in the months of April and May, the Bureau increased releases from Upper Klamath Lake in an

---

[1] In the 2020 BiOp, USFWS did acknowledge that a new paper published in March 2020 may suggest a connection between Upper Klamath Lake levels and water quality. BiOp at 129. This paper was too new to be considered as part of the 2020 BiOp but will be considered as part of the ongoing formal consultation process. *Id*.

effort to meet the target flows for Iron Gate Dam. Pl.'s Mem. Supp. TRO 21. The Bureau has been unable to maintain the Upper Klamath Lake elevation boundaries; current hydrologic conditions are thus outside the scope analyzed in the 2020 BiOp. Def.'s Opp'n TRO 21, ECF No. 25. The Bureau is unlikely to meet any of the subsequent boundary conditions in the 2020 BiOp, "even without water deliveries to the Klamath Project." *Id*. USFWS acknowledged the "extreme hydrologic conditions" and expects that the Bureau will maintain Upper Klamath Lake at 4138.0 feet or above. Stip. Req. Judicial Notice, Ex. 8 at 2, ECF No. 24.

## JURISDICTION

Defendant argues that this Court does not have subject matter jurisdiction because Plaintiff failed to meet the 60-day notice requirement before bringing suit under the ESA. Def.'s Opp'n TRO 16–19; *see* 16 U.S.C. § 1540(g)(2) ("No action may be commenced… prior to sixty days after written notice has been given to the Secretary setting forth the reasons why an emergency is thought to exist with respect to an endangered species or a threatened species"). Plaintiff sent a letter to Defendant on February 12, 2021, providing notice of their "intention to file suit against the [Bureau] for violations of Sections 7 and 9 of the [ESA]." Gentry Decl., Ex. A at 1, ECF No. 5. Plaintiff asserts that this letter satisfies the 60-day notice requirement. Pl.'s Compl. 3, ECF No. 1.

Defendant first argues that Plaintiff's notice letter is deficient because it "does not mention any alleged violation of ESA Section 7, and hence failed to provide notice of the violation now alleged in Count II of the complaint." Def's Opp'n TRO 17. This is not true. The first paragraph of the notice letter explicitly mentions a perceived Section 7 violation and goes on to explain the Tribes' belief that Bureau actions "would adversely modify the species' critical habitat." Gentry Decl., Ex. A at 1. The remainder of the letter explains how the current and

7 – OPINION AND ORDER

upcoming conditions have negatively impacted the suckers' habitat. The facts alleged in Count II

of Plaintiff's complaint are the same facts alleged in the notice letter. Gentry Decl., Ex. A at 3–4;

Pl.'s Compl. 29–30.

Defendant then argues that Plaintiff's notice letter only referenced a potential Section 9

violation "and merely speculated about whether a violation might occur in the future." Def.'s

Opp'n TRO. 17. While's Plaintiff's notice letter was forward-facing and primarily focused on

the potential threats to the C'waam and Koptu this year, the letter also noted Plaintiff's belief

that "Reclamation failed to comply with T&C 1c in 2020. Instead, it delivered both augmentation

water and irrigation water to Project users during April and May while UKL dropped and then

remained below elevation 4142.0 feet." Gentry Decl., Ex. A at 4. The rest of the notice letter

outlines Plaintiff's assertion that the Bureau would be in further violation of T&C 1c if Upper

Klamath Lake fell below 4142 in April or May 2021. *Id*. at 3–4. Defendant argues that because

there was not an ongoing violation of Section 9 for the agency to correct at the time it received

the notice, the notice letter was deficient.

"The purpose of the 60–day notice provision is to put the agencies on notice of a

perceived violation of the statute and an intent to sue. When given notice, the agencies have an

opportunity to review their actions and take corrective measures if warranted." *Sw. Ctr. for*

*Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998). The

notice letter informed Defendant of Plaintiff's assertion that, without immediate corrective

action, Defendant would be in violation of Sections 7 and 9 of the ESA and of Plaintiff's

intention to file suit. The notice letter provided Defendant an opportunity to take corrective

measures, in collaboration with Plaintiff and other stakeholders, to avoid this alleged violation.

Defendant argues that "hydrology that post-dated the Tribes' purported notice letter is critical to

8 – OPINION AND ORDER

the current low lake elevation and their current Section 9 claim," essentially arguing that the conditions that led to Upper Klamath Lake falling below 4142 feet on April 1, 2021 were not present when Plaintiff sent their notice letter, and so Defendant has not had the full 60 days to cure the alleged violation. Def.'s Opp'n TRO 18. While hydrologic conditions have only gotten worse since Plaintiff's notice letter, the writing was on the wall far before February 12, 2021. Defendant also asserts they "began coordinating with FWS and NMFS in January 2021 'to determine the causative factors for potentially falling outside BiOp 'boundary conditions', consistent with the meet and confer provisions of… T&C 1c.'" Def.'s Opp'n TRO 21. Defendant seems to argue both that they did not have sufficient time to address the concerns that Plaintiff raised in their notice letter, and that they were addressing the concerns a month before the notice letter. Plaintiff's notice letter provided sufficient information for Defendant to know exactly what the alleged violation would be. The notice letter also gave sufficient time for Defendant to address the issue and take corrective action. The Court finds that it does have jurisdiction.

## STANDARDS

The standards for issuing a temporary restraining order are similar to those required for a preliminary injunction. *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F.Supp. 1320, 1323 (N.D. Cal. 1995). A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008). The first *Winters* factor "is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three *Winter* elements." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal citations and quotations omitted). "The

9 – OPINION AND ORDER

court's decision on a motion for a preliminary injunction is not a ruling on the merits. *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

## **DISCUSSION**

Plaintiff alleges that the Bureau has violated Sections 7 and 9 of the ESA. ESA Section 7 requires that Federal agencies "insure" that any agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). ESA Section 9 bars the taking of any listed species. 16 U.S.C. § 1538(a)(1). ESA Section 9 bars the taking of any listed species. 16 U.S.C. § 1538(a)(1). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct. 16 U.S.C. § 1532(19).

When a Federal agency determines that its actions "may affect listed species or critical habitat," the agency must initiate the formal consultation process with USFWS, NMFS, or both, depending on the listed species that may be affected. 50 C.F.R. § 402.14(a). As part of the formal consultation process, USFWS or NMFS release a biological opinion that discusses the effects of the proposed action on listed species and gives the Service's opinion on whether the proposed action is likely or not likely "to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a ["jeopardy" or a] "no jeopardy" biological opinion)." 50 C.F.R. § 402.14(h)(1). When the Service determines that the proposed agency action will not violate ESA § 7(a)(2) but will result in a certain amount in incidental take of the species, the Service will include an Incidental Take Statement ("ITS") in the biological opinion. 50 C.F.R. § 402.14(i)(1). In addition to detailing the expected impact, the ITS "[s]ets forth the terms and conditions… that must be complied with by the Federal agency." 50 C.F.R. §

10 – OPINION AND ORDER

402.14(i)(1)(iv). "If during the course of the action the amount or extent of incidental taking… is exceeded, the Federal agency must reinitiate consultation immediately." 50 C.F.R. § 402.14(i)(4). The ITS provides a safe harbor for the Federal agency from ESA Section 9 liability, as "[a]ny taking… which is in compliance with the terms and conditions of [the ITS] is not a prohibited taking under the Act." 50 C.F.R. § 402.14(i)(5).

While an agency must comply with the Terms and Conditions of the ITS to be protected from Section 9 liability, even if an agency action results in more take than anticipated, there might not be Section 9 liability so long as the agency complied with the Terms and Conditions of the ITS. *See Bennett v. Spear*, 520 U.S. 154, 170 (1997) ("the Biological Opinion's Incidental Take Statement constitutes a permit authorizing the action agency to 'take' the endangered or threatened species so long as it respects the Service's 'terms and conditions.'").

Plaintiff alleges that the Bureau has failed to comply with Terms and Conditions 1c ("T&C 1c") of the 2020 BiOp's ITS. Pl.'s Compl. 21, 25. T&C 1c requires that the Bureau "take corrective actions to ensure UKL elevations are managed within the scope of the proposed action." 2020 BiOp at 213. These boundary conditions are:

- 2 consecutive years in which UKL surface elevations fall below 4141 ft (1262.48 m) in April or May; or any year in which UKL surface elevations fall below 4142 ft (1262.48 m) in April or May when EWA Augmentation is provided
- UKL surface elevations below observed elevations in 2010 in April or May
- UKL surface elevations below 4138.00 ft (1261.26 m) at any time
- More than one water year when UKL surface elevations drop below 4138.25 ft (1261.4 m) in September
- Any year with UKL surface elevations less than 4140.0 ft (1261.9 m) by July 15, more than 1 year when surface elevations fall below 4140.5 ft (1262.0 m) by July 15, or more

> than 2 years when surface elevations fall below 4140.8 ft
> (1261.1 m) by July 15

*Id*. USFWS found that these conditions were "extremely unlikely to occur during the term of this BiOp" but that if they did, "Reclamation shall immediately consult with the Service concerning the cause to adaptively manage and take corrective action." *Id*.

Plaintiff argues that the Bureau first violated the terms and conditions in April 2020 when Upper Klamath Lake fell below 4142 feet when EWA augmentation was provided. Pl.'s Compl. 21. Plaintiff also argues that because Upper Klamath Lake fell below 4142 feet in April 2020, the Bureau had an obligation to ensure that the lake did not fall below 4142 feet in April or May 2021. *Id*. at 22. However, the incidental take statement in the 2020 BiOp acknowledged that this was a possibility, although remote. BiOp at 207. As soon as it became clear that Upper Klamath Lake elevation would not be maintained within the scope of the BiOp, the Bureau's obligation under the Terms and Conditions of the Incidental Take Statement was to immediately consult with USFWS "to adaptively manage and take corrective actions." BiOp at 213;

Plaintiff argues that the use of the word "consult" in Term and Condition 1c means that, at a minimum, the Bureau had an obligation to engage in "informal consultation" with USFWS. Pl.'s Suppl. Brief 2, ECF No. 47. "Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency…, designed to assist the Federal agency in determining whether formal consultation or a conference is required." 50 C.F.R. § 402.13(a). In support, Plaintiff cites to the years following the 2013 BiOp, when the Bureau missed certain threshold requirements "but each time 'identified the reasons for missing thresholds and whether they were within the scope of the BiOp and then consulted with

USFWS.'" Pl.'s Suppl. Br. 2 (citing *Klamath Tribes v. United States Bureau of Reclamation*, No. 18-CV-03078-WHO, 2018 WL 3570865, at \*14 (N.D. Cal. July 25, 2018)).

Plaintiff also argues that the Bureau had an obligation to reinitiate formal consultation at this time. Pl.'s Suppl. Br. 4. Reinitiation of formal consultation is triggered when "the amount or extent of incidental take is exceeded" or when "new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion." BiOp at 231; *see also* 50 C.F.R. § 402.14(i)(4). Because hydrologic conditions are outside the scope of the BiOp and the ITS, it is likely that the amount and extent of take has been exceeded. Further, the current lower elevations were explicitly not considered in the opinion.

Defendant argues that the word "consult" in Term and Condition 1c was not a term of art but rather "used in the ordinary sense, meaning to confer, discuss, and coordinate." Def.'s Suppl. Br. 3, ECF No. 48. This is supported by the correspondence from USFWS, confirming that "T&C 1c of the Service's BiOp requires Reclamation to coordinate with the Service and take corrective actions if elevation levels in UKL fall outside the stated boundary condition." Stip. Req. Judicial Notice, Ex. 8 at 1.

Defendant maintains that they have complied with all the consultation requirements of the 2020 BiOp Terms and Conditions. Def.'s Suppl. Br. 1–4. When 2021 was predicted to be another dry year and thus outside the scope of the 2020 BiOp, the Bureau worked with USFWS and NMFS to develop Temporary Operating Procedures to "adaptively manage and take corrective actions." The Bureau contacted USFWS and NMFS in January 2021 to "'determine the causative factors for potentially falling outside BiOp 'boundary conditions.'" Def.'s Opp'n TRO at 21. The Bureau continued to coordinate with the Services and sent them the Temporary

13 – OPINION AND ORDER

Operating Procedures for review. Def.'s Suppl. Br. 4; *see also* Stip. Req. Judicial Notice, Ex. 8 at 1 (USFWS "acknowledges that Reclamation did meet and confer with the Service in recent months to address low ULK elevations and potential corrective action."); Stip. Req. Judicial Notice, Ex. 6 at 2 ("NMFS also acknowledges that Reclamation has taken actions to closely coordinate with the Services consistent with the process outlined in Term and Condition 1A of the NMFS 2019 Biological Opinion.").

To the extent that the Bureau was required to engage in informal consultation with USFWS, they have satisfied this burden by maintaining regular communication with the Services as they determined the causes for the low elevation of Upper Klamath Lake and developed temporary operating procedures to address the situation. The Bureau is also engaged in formal reinitiated consultation with USFWS and NMFS and has been since November 2019. Def.'s Suppl. Br. 5. This consultation is scheduled to conclude by September 30, 2022. *Id*. While the 2021 temporary operating procedures "are in-season corrective actions," they "will be considered in the ongoing consultation, as will the ongoing effects of the droughts of 2020 and 2021." *Id*.

In coordination with USFWS and NMFS, the Bureau has determined that the cause of the low Upper Klamath Lake elevation is the severe droughts of 2020 and 2021. As USFWS acknowledged, "hydrologic conditions experienced to date this year in the Klamath Basin are unprecedented" and the "challenging hydrology is rooted in natural causes and was not anticipated by the agencies." Stip. Req. Judicial Notice, Ex. 8 at 1. To adaptively manage the situation, the Bureau proposed temporary operating procedures, in effect from April 15, 2021 to September 30, 2021. Stip. Req. Judicial Notice, Ex. 7 at 3. Under these temporary operating procedures, the window for a surface flushing flow is extended through June 1, 2021, and there are specific Upper Klamath Lake elevation conditions for a surface flushing flow to happen. *Id*.

The Bureau recognizes that these temporary operating procedures "may need to be adjusted in-season due to fast-changing hydrology" and will continue to coordinate with the Services as needed. Def.'s Suppl. Br. 5.

The Bureau has also informed Project users that all Project deliveries are suspended for the current time while they address the low elevations at Upper Klamath Lake. The Bureau first sent letters to Project users on March 12 and April 2, 2021, informing them that "water is currently unavailable from the Upper Klamath Lake (UKL) and the Klamath River for irrigation purposes." Stip. Req. Judicial Notice, Ex. 12; Stip. Req. Judicial Notice, Ex. 13. The Bureau then released their 2021 Annual Operations Plan in April 2021. The Plan acknowledges the dry conditions and their ESA obligations and notes that "[w]ater for irrigation or charging canals will not be available prior to May 15." Stip. Req. Judicial Notice, Ex. 5 at 5. The Bureau has continued to follow up with Project users regarding the limited water availability. *See, e.g.,* Stip. Req. Judicial Notice, Ex. 16 (reinforcing the notice to Klamath Irrigation District that water was currently unavailable for irrigation needs); Stip. Req. Judicial Notice, Ex. 24 (directing Klamath Drainage District to "immediately cease diversions from the Klamath River through the Ady and North Canals").

Plaintiff's Section 7 claim depends on the same facts and argues that the Bureau's failure to maintain the boundary Upper Klamath Lake elevations in the 2020 BiOp has adversely modified the suckers' habitat "by diminishing the amount of habitat available for vital spawning and rearing activities and threatening reduced safe access to important water quality refugia." Pl.'s Compl. 29–30. 2021 is an exceptionally dry year. The Bureau has taken proactive steps to keep Upper Klamath Lake levels as high as possible while complying with their obligations under the NMFS 2019 BiOp and the Interim Operative Plan, including temporarily suspending

15 – OPINION AND ORDER

Project deliveries and diversions. The Bureau cannot control the current hydrologic conditions; they can only work within these natural limitations.

While Upper Klamath Lake levels have fallen outside the scope of what was considered in the 2020 BiOp, the Bureau has continued to comply with the terms and conditions by engaging in ongoing consultation with the Services and creating the temporary operating procedures. The Bureau is also not responsible for the unprecedented drought this year. As a threshold matter, the Klamath Tribes have not shown they are likely to succeed on the merits.

## **CONCLUSION**

For the reasons set forth above, Plaintiff's Motion for Temporary Restraining Order (ECF No. 2) and Motion for Preliminary Injunction (ECF No. 7) are DENIED.

IT IS SO ORDERED.

DATED this 6th day of May 2021.

/s/ Michael McShane
Michael McShane
United States District Judge

16 – OPINION AND ORDER